**STONE & WEBSTER ENGINEERING CORPORATION, Plaintiff,**

v.

**LOCAL UNION NO. 38 OF OSWEGO, NEW YORK AND VICINITY, INTERNATIONAL BROTHERHOOD OF PAINTERS AND ALLIED TRADES (AFL-CIO), Defendant.**

No. 77-CV-395.

United States District Court,
N. D. New York.

Oct. 19, 1978.

---

Bryant, O'Dell & Basso, Syracuse, N. Y., for plaintiff; Brian M. Cole, Syracuse, N. Y., of counsel.

Pidgeon & Eby, Oswego, N. Y., for defendant; James K. Eby, Oswego, N. Y., of counsel.

MUNSON, District Judge.

## MEMORANDUM–DECISION AND ORDER

This Opinion is addressed to two separate actions presently before the Court—one as an action to enforce a Collective Bargaining Agreement under Section 301 of the Labor Management Relations Act, 29 U.S.C § 185, the other to vacate an arbitrator's award pursuant to the United States Arbitration Act, Title 9 U.S.C. §§ 1–14. Both actions involve the same parties, and revolve around the same set of essential facts.

*Motion For Preliminary Injunction*

Stone & Webster Engineering Corporation, the plaintiff herein, has commenced an action pursuant to Section 301 of the Labor Management Relations Act, 29 U.S.C § 185, seeking to enjoin a strike by the defendant, Local 38 of the International Brotherhood of Painters and Allied Trades (hereinafter "Local 38"), upon the basis that such action violates the "no-strike" clause contained within the Collective Bargaining Agreement in force between the two parties. Plaintiff has petitioned the Court for a preliminary injunction against any further work stoppage by the defendant and its members pending the outcome of the present litigation.

A hearing was conducted, upon the motion for a preliminary injunction, before this Court on October 19 and 20, 1977, at which time a total of two witnesses were called, one by each party. In addition, a written Stipulation of Facts entered into between the parties was submitted as a part of the record (hearing Exhibit 2). The

defendant Local 38 has agreed not to strike pending resolution of the motion at bar, thereby obviating the necessity of ruling upon plaintiff's initial request for a Temporary Restraining Order.

## Findings of Fact

1. Stone & Webster Engineering Corporation, a Massachusetts corporation with its principal place of business in Boston, Massachusetts, the plaintiff herein, has been retained by the Niagara Mohawk Power Corporation to oversee the construction of a nuclear power plant to be located at Nine Mile Point, in Lycoming, New York.

2. Plaintiff, in turn, utilizes various contractors to perform the actual construction work, with between twelve and fifteen contractors working at any given time.

3. Plaintiff makes work assignments to the several independent contractors. In addition, plaintiff provides equipment, supplies, temporary services such as water, compressed air and the like, temporary housing for the various operations, and receives and distributes materials used on the job.

4. Among those workers employed at the Nine Mile Point jobsite are some members of Local # 38 of the International Brotherhood of Painters and Allied Trades, AFL–CIO, defendant herein. Also employed at the site are members of Local # 545 of the International Union of Operating Engineers.

5. Plaintiff is a party to Collective Bargaining Agreements with both the defendant (Exhibit 1, appended to plaintiff's hearing Exhibit 1), and Local # 545 of the International Union of Operating Engineers (Exhibit 2, appended to plaintiff's hearing Exhibit 1).

6. A dispute arose over which of the two unions involved, viz. painters or operating engineers, had jurisdiction over painting work performed on some equipment used in the project. In response to that dispute, jobsite meetings were held on September 23, 1976, and October 6, 1976, attended by representatives of plaintiff and the two unions.

7. On October 18, 1976, plaintiff issued a job assignment, ordering the operating engineers to paint equipment operated by men of their craft, but not equipment operated by workers of other crafts (Exhibit A, appended to plaintiff's hearing Exhibit 2).

8. The assignment of October 18, 1976, was modified on October 20, 1976, but only to the extent that equipment operated by crafts other than the operating engineers was ordered painted by the painters (Exhibit B, appended to plaintiff's hearing Exhibit 2).

9. By written notice dated October 20, 1976, the defendant apprised the International Brotherhood of Painters and Allied Trades of the October 18, 1976 job assignment, which the defendant protested on jurisdictional grounds (defendant's hearing Exhibit 17).

10. By telegram, dated October 29, 1976, the plaintiff submitted the dispute to the Impartial Jurisdictional Disputes Board for its consideration (Exhibit 4, appended to plaintiff's hearing Exhibit 1).

11. In a letter of November 1, 1976, to the two international unions involved, the Impartial jurisdictional Disputes Board indicated that it would consider the matter on November 11, 1976, giving the two unions until November 10, 1976, to state their respective positions (Exhibit 5, appended to plaintiff's hearing Exhibit 1).

12. Also by letter of November 1, 1976, the Board notified the plaintiff of its intention to consider the matter, and directed the plaintiff to proceed in accordance with the original work assignment pending resolution of the matter (Exhibit 6, appended to plaintiff's hearing Exhibit 1).

13. Following a protest by the painters of the job assignment, a jobsite meeting was held in the latter part of October, 1976, between representatives of the two unions. No resolution of the problem resulted from that meeting.

14. On November 8, 1976, representatives of the two international unions entered into a written resolution of the dis-

pute, agreeing that the painters should perform all jobsite painting except for touch-up work (Exhibit 7, appended to plaintiff's hearing Exhibit 1).

15. The plaintiff was directed by the Impartial Jurisdictional Disputes Board in a letter dated November 8, 1976, to proceed under the new agreement whereby all painting except touch-up was to be performed by the painters (Exhibit 8, appended to plaintiff's hearing Exhibit 1).

16. By letter dated November 15, 1976, the plaintiff notified a representative of the defendant that it was rescinding the assignment of October 18, 1976, with its October 20, 1976 clarification, and was proceeding according to the terms of the November 8, 1976 agreement (Exhibit 9, appended to plaintiff's hearing Exhibit 1).

17. Sometime during April of 1977, a further dispute arose with regard to the agreement of November 8, 1976, and in particular over the interpretation of the phrase "touch-up work," as that phrase was used in the agreement.

18. A meeting was held on April 20, 1977, with representatives of the plaintiff, defendant, and operating engineers present to discuss the dispute.

19. At the April 20, 1977 meeting, a proposal based upon the Webster's New Collegiate Dictionary definition of "touch-up" was put forth, and was assented to by the painters, but not by the operating engineers (plaintiff's hearing Exhibit 3).

20. By telegram dated August 23, 1977 (Exhibit C, appended to plaintiff's hearing Exhibit 2), defendant notified the plaintiff that it had sent a telegram to the International Painters' Union protesting Stone & Webster's assignment of non-touch-up work to operating engineers, in violation of the agreement of November 8, 1976.

21. Plaintiff, in a telegram of August 25, 1977 (plaintiff's hearing Exhibit 4), apprised the Impartial Jurisdictional Disputes Board of the renewed jurisdictional dispute, and requested the assignment of a repre-

sentative from that body to attend a jobsite meeting.

22. By letter dated August 26, 1977 (plaintiff's hearing Exhibit 5), the Impartial Jurisdictional Disputes Board notified the International Painters' Union to direct the defendant to cease threats of work stoppage, and to adjust the dispute, either directly or in accordance with the Board's Procedural Rules. Plaintiff was, in turn, directed by that same letter to proceed with the disputed work pursuant to the November 8, 1976 directive.

23. The International Painters' Union thereafter apprised the Board, in a letter dated August 30, 1977 (plaintiff's hearing Exhibit 6), that it had requested a meeting with a representative of the International Union of Operating Engineers for purposes of resolving the dispute.

24. By telegram dated August 31, 1977 (Exhibit D, appended to plaintiff's hearing Exhibit 2), plaintiff requested that the International Painters' Union assign a representative to attend a jobsite meeting concerning the dispute.

25. In a telegram dated September 2, 1977 (Exhibit E, appended to plaintiff's hearing Exhibit 2), defendant notified the plaintiff that it was required to appear before the local Joint Trade Board on September 7, 1977, pursuant to Article XV of the parties' Collective Bargaining Agreement, for alleged violation of the November 8, 1976 decision.

26. In response, plaintiff notified the defendant, by telegram dated September 6, 1977 (Exhibit E, appended to plaintiff's hearing Exhibit 2), that it objected to the Local Board's taking jurisdiction in the matter, and accordingly would not appear at the appointed time.

27. By telegram dated September 7, 1977 (Exhibit G, appended to plaintiff's hearing Exhibit 2), defendant again advised plaintiff of the hearing of September 7, 1977, before the local Joint Trade Board.

28. The Impartial Jurisdictional Disputes Board sent the International Painters'

Union a letter dated September 7, 1977 (plaintiff's hearing Exhibit 8).[1]

29. By letter dated September 8, 1977 (Exhibit A, appended to plaintiff's hearing Exhibit 2), the local Joint Trade Board informed the plaintiff that it had been found guilty, by unanimous vote, of having violated the decision of November 8, 1976, from the Impartial Jurisdictional Disputes Board. Plaintiff was further apprised that a fine of $25,000 had been imposed, and that plaintiff had a right to appeal the decision, within ten days, to the National Joint Trade Board.

30. On September 20, 1977, a jobsite meeting was held, with international and local representatives of both Painters' and Operating Engineers' unions in attendance, together with representatives of the plaintiff (minutes appended as Exhibit J to plaintiff's hearing Exhibit 2). Resolution of the dispute was discussed, but no agreement was reached.

31. At the close of that meeting, the plaintiff orally notified the defendant that it did not recognize the jurisdiction of the local Joint Trade Board to issue the decision of September 8, 1977, and consequently would not honor the $25,000 award.

32. By telegram dated September 21, 1977 (Exhibit K, appended to plaintiff's hearing Exhibit 2), defendant informed the plaintiff that the matter of the local Joint Trade Board award was being submitted to the International Painters' Union for further consideration.

33. On September 28, 1977, the Impartial Jurisdictional Disputes Board sent the International Painters' Union a telegram (plaintiff's hearing Exhibit 10).[2]

34. On October 3, 1977, at approximately 6:15 A.M., the defendant commenced a strike against the Nine Mile Point construction site, with about ten members of Local 38 peacefully picketing at three entrances to that site.

35. Approximately ten members of the defendant again picketed the three construction site entrances on October 4, 1977.

36. On October 5, 1977, approximately fifty members of defendant Local 38 picketed the three entrances to the jobsite.

37. The job action was honored by workers of other trades, with no workers crossing the picket lines on the first two days of the strike, and approximately twenty to thirty returning to work on October 5, 1977.

38. All construction workers, including the defendant's members, returned to work on October 6, 1977, and continued working through the time that the hearing was conducted.

39. A total of approximately 1400 workers are employed at the construction site.

40. During the time of the strike, two shifts per day were operating at the Nine Mile Point site.

41. The work stoppage by the 1400 employees resulting from the strike in issue will probably affect the September, 1982 completion date, with respect to which the plaintiff is obligated to the Niagara Mohawk Power Corporation.

42. In addition to the work stoppage, the strike caused equipment owned by the plaintiff, with a market value of about 8.5 million dollars, and depreciating daily, to remain idle on the days in question.

43. Moreover, rented equipment, costing the plaintiff approximately $6,000 per day, remained idle during the strike.

44. The strike was a direct result of the plaintiff's refusal to honor, or take an appeal from, what the defendant feels to be a

1. In that letter, the Impartial Jurisdictional Disputes Board notified the International Painters' Union that the matter was improperly before the local Joint Trade Board. The Union was directed to cease all threats of work stoppage. The letter was received in evidence only for the fact that it was sent, and not for its contents.

2. In that communication, the International Painters' Union was instructed by the Impartial Jurisdictional Disputes Board to direct the defendant to cease all threats of job action over the dispute. Both parties were directed to proceed in accordance with the November 8, 1976 decision. That telegram, like Exhibit 8, was received solely for the fact that it was sent, and not for its contents.

valid decision and award made by the local Joint Trade Board.

45. The Collective Bargaining Agreement between the parties contains a general "no strike" clause.

46. The Agreement also contains a provision allowing the defendant to strike for plaintiff's failure to comply with a decision of the local Joint Trade Board.

47. The sole provision within the Agreement relative to appeal from a determination of the local Joint Trade Board provides for such an appeal only in the case of a deadlocked, three-to-three decision of that Board. Appeal to the National Joint Trade Board is automatic in such a situation.

48. Article XV of that Agreement, which article is entitled "Arbitration and Joint Trade Board," provides that all questions relating to interpretation or violation of the Agreement shall be submitted to the local Joint Trade Board.

49. Article XI, § 10 of the Agreement provides that, with regard to jurisdictional disputes, the parties shall be bound by the National Joint Board, which was the predecessor to the Impartial Jurisdictional Disputes Board.

50. The parties agree that the reference to a National Joint Board contained within Article XI, § 10 of the Agreement relates to the Impartial Jurisdictional Disputes Board.

These findings may be considered to be the Court's findings of fact, as are required to be made under F.R.C.P. Rules 52(a) and 65, as well as Section 7 of the Norris-LaGuardia Act, 29 U.S.C. § 107.

## DISCUSSION

With the enactment of Section 4 of the Norris-LaGuardia Act, 29 U.S.C. § 104, Congress intended to combat what had previously been pro-management abuse, by the courts, of the power to freely enjoin job actions resulting from labor disputes. *Boys Markets v. Retail Clerks Union,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). The Norris-LaGuardia Act, as a whole, was formulated as a limitation upon the jurisdiction of the District Courts. Norris-La-Guardia Act § 2, 29 U.S.C. § 102. Section 4 of that Act accordingly denies the courts jurisdiction to issue injunctions with respect to labor disputes, absent special and compelling circumstances, such as in a case presenting a serious threat to private property. Norris-LaGuardia Act §§ 7 and 8, 29 U.S.C. §§ 107 and 108; *Truck Drivers Local U. No. 807 v. Bohack Corp.,* 541 F.2d 312 (2d Cir. 1976).

The Supreme Court has found that Congress, by enacting Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, which allows for suits against labor organizations for breach of Collective Bargaining Agreements, carved out an exception to the aforementioned proscription against enjoining labor disputes. *Boys Markets v. Retail Clerks Union, supra* ; see also *Gateway Coal Co. v. Mine Workers,* 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974). That exception, which has been described as an extremely narrow one, allows a federal District Court to issue an injunction in aid of enforcing a mandatory arbitration clause to which the parties have agreed in a collective bargaining agreement. *Emery Air Freight Corporation v. Local Union 295,* 449 F.2d 586 (2d Cir. 1971), cert. den. 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972). This, of course, is in keeping with the frequently-enunciated Congressional policy of fostering peaceful settlement of labor disputes through private, non-judicial channels. *Columbia Broadcasting System, Inc. v. American Record. & Broad. Ass'n.,* 414 F.2d 1326 (2d Cir. 1969); *Sheet Metal Workers' Int. U. v. Aetna Steel Prod. Corp.,* 359 F.2d 1 (1st Cir. 1966), cert. den. 385 U.S. 839, 87 S.Ct. 86, 17 L.Ed.2d 72 (1966). The sole purpose for an injunction under the *Boys Markets* case, then, is to vindicate the arbitration process to which the parties are contractually bound to submit. *New York Telephone Company v. Communications Workers of America, AFL–CIO,* 445 F.2d 39 (2d Cir. 1971).

The necessary prerequisites for falling within the *Boys Markets* exception to Section 4 of the Norris-LaGuardia Act

are threefold: 1) the Collective Bargaining Agreement must contain a mandatory arbitration clause; 2) the agreement must contain a "no-strike" clause; and 3) the strike must be over a dispute which is subject to mandatory arbitration under the terms of the agreement. *Boys Markets v. Retail Clerks Union, supra*; see also *Buffalo Forge Co. v. Steelworkers*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976). In addition, ordinary principles of equity must be applied before the court, in its discretion, can issue an injunction. *Boys Markets v. Retail Clerks Union, supra; Valmac Industries, Inc. v. Food Handlers' Loc. 425, etc.*, 519 F.2d 263 (8th Cir. 1975), vacated on other gds. 428 U.S. 906, 96 S.Ct. 3215, 49 L.Ed.2d 1213 (1976). Thus, the plaintiff at bar, in order to prevail on its motion, must not only show that the elements of *Boys Markets* have been satisfied, but must in addition demonstrate either probable success upon the merits of the case and possible irreparable injury, or the existence of a sufficiently serious question on the merits, which ought to be litigated, and a balance of hardships tipped markedly in its favor. *Kampmeier v. Nyquist*, 553 F.2d 296, 299 (2d Cir. 1977); *Sonesta Int'l Hotels Corp. v. Wellington Associates*, 483 F.2d 247 (2d Cir. 1973). Under either prong of the *Kampmeier-Sonesta* test for preliminary injunctive relief, the petitioner bears a heavy burden of demonstrating that actual and irreparable harm will occur, absent the relief sought. *State of New York v. Nuclear Regulatory Commission*, 550 F.2d 745 (2d Cir. 1977).

The dispute underlying the work stoppage which the plaintiff now seeks to enjoin stems from the plaintiff's refusal to abide by an award of the local Joint Trade Board, the mechanism established by the parties to resolve disputes arising out of the Collective Bargaining Agreement ("Agreement") (Exhibit 1, appended to hearing Exhibit 1, Art. XV). The plaintiff, of course, claims that the original grievance, for which the defendant sought help from the local Joint Trade Board, was more in the nature of a jurisdictional dispute, and therefore properly should have been taken up with the Impartial Jurisdictional Disputes Board, pursuant to Article XI, § 10 of the parties' Collective Bargaining Agreement.[3]

▮ Whatever was the nature of the original dispute, involving the assignment of "touch-up" work, and interpretation of that term, it is clear that what is now in issue is the plaintiff's failure to honor the decision of the local Joint Trade Board. Viewed in that light, it cannot be successfully argued, even under the most strained reading of the Agreement, that the present dispute is subject to mandatory arbitration. In fact, the subject of the dispute is itself the result of an arbitration under the Agreement, albeit one quite possibly conducted in an improper forum.

▮ The Plaintiff, then, has failed to demonstrate, as is required under *Boys Markets*, that the present dispute is subject to mandatory arbitration. *Buffalo Forge Co. v. Steelworkers, supra; Emery Air Freight v. Local Union 295, supra*. Moreover, the plaintiff cannot possibly show that the "no-strike" clause contained within the Agreement applies to the present dispute, in light of Article XVI, § 5(a), which provides, in relevant part:

> In the event of the employers [sic] failing to comply with such Trade Board action as aforesaid, the union shall have the right to remove all employees of the employer and picket such employer notwithstanding any provisions of the Collective Bargaining Agreement.

As such, this Court lacks jurisdiction to issue the injunction sought by the plaintiff. Norris-LaGuardia Act § 4, 29 U.S.C. § 104.

---

**3.** That portion of the Collective Bargaining Agreement provides:

> Jurisdictional Dispute. The union and the employer agree to be bound by the National Joint Board for settlement of jurisdictional disputes.

The National Joint Board was the predecessor to the present Impartial Jurisdictional Disputes Board.

As the Court of Appeals for the Second Circuit has appropriately stated,

> Where the collective agreement, as here, excepts from the requirement of arbitration certain types of contract violations and provides that the union retains the right to strike with respect to such violations, no injunction can issue against a strike where the union presents a colorable claim that such violations have occurred. *Standard Food Products Corp. v. Brandenburg*, 436 F.2d 964, 966 (2d Cir. 1970).

■ Even assuming, for the sake of argument, that this case did fall within the narrow exception of *Boys Markets*, the plaintiff's motion for a preliminary injunction would nevertheless have to be denied, based upon ordinary principles of equity. The job action now complained of was terminated even prior to the time when the defendants agreed, in court, to refrain from further work stoppage pending the outcome of the present motion. Moreover, testimony was elicited at the hearing to show that the defendant Local 38 has been ordered by the International Brotherhood of Painters and Allied Trades, AFL–CIO, not to strike over this dispute. This Court therefore concludes that there has been no sufficient showing of any danger of actual and imminent irreparable harm to the plaintiff, such as is required for the issuance of a preliminary injunction. *State of New York v. Nuclear Regulatory Commission, supra.*

## CONCLUSIONS OF LAW

The facts of this case do not bring it within the narrow *Boys Markets* exception to Section 4 of the Norris-LaGuardia Act's proscription of injunctions against labor disputes. This Court therefore lacks jurisdiction to enjoin the defendant from engaging in a work stoppage over the dispute in issue. Further, the plaintiff has failed to show that an injunction is required under the ordinary principles of equity.

## ARBITRATION ACT PETITION

In a related proceeding, plaintiff Stone and Webster has sought leave to attack the validity of the local Joint Trade Board award of $25,000 by way of a petition and notice of motion in accordance with the terms of the United States Arbitration Act, Title 9 U.S.C. §§ 1–14. The defendants resists the utilization of the Arbitration Act in this case, contending that the matter is already properly before the Court, under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, by virtue of its counterclaim, in the principal action, for enforcement of the award. The defendant also asserts that this Court may not review the validity of the Joint Trade Board award, in light of the precepts outlined by the Supreme Court in the *Steelworkers' Trilogy (United Steelworkers of America v. American Manufacturing Company)*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960).

## I. Procedure

The question of whether or not the Arbitration Act in and of itself provides a federal court with jurisdiction to vindicate an arbitration clause of a Collective Bargaining Agreement is unsettled in this Circuit. See *International Ass'n of Mach. & A. Wkrs. v. General Elec. Co.*, 406 F.2d 1046 (2d Cir. 1969); *Engineers Association v. Sperry Gyroscope Co., Etc.*, 251 F.2d 133 (2d Cir. 1957); *Signal-Stat Corporation v. Local 475, Etc.*, 235 F.2d 298 (2d Cir. 1956); *Metal Products Workers U., Local 1645 v. Torrington Co.*, 242 F.Supp. 813 (D.Conn.1965), aff'd 358 F.2d 103 (2d Cir. 1966); see also *In the Matter of the Arbitration Between Fackar Company and R.A. Hanson DISC, Ltd.*, (2d Cir. slip op. p. 4495, 1978). It is true that some courts have intimated that it is necessary, both in the context of Collective Bargaining Agreements and other types of contracts to which the Act applies, to search for an independent basis for subject matter jurisdiction, such as diversity of citizenship with more than $10,000 in controversy, before applying the terms of the Arbitration Act. *Textile Workers v. Lincoln Mills*, 353 U.S. 448, 466, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957) (Frankfurter, J. dissenting); *City of Naples v. Prepakt Con-*

crete Company, 490 F.2d 182 (5th Cir. 1974), mod. and reh. den. 494 F.2d 511 (5th Cir. 1974), cert. den. 419 U.S. 843, 95 S.Ct. 76, 42 L.Ed.2d 71 (1974); Pock v. New York Typographical Union No. 6, 223 F.Supp. 181 (S.D.N.Y.1963).

■ There can be no question, however, that the Court in this instance has subject matter jurisdiction under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 to consider, to the extent indicated below, the validity of the award in issue.[4] International Ass'n of Mach. & A. Wkrs. v. General Elec. Co., supra; White Motor Corp. v. International U., U.A., A. & A.I.W., 491 F.2d 189 (2d Cir. 1974). As such, the Court will consider the matter on the merits, thereby rendering academic the question of whether the Arbitration Act may be properly invoked as a vehicle for enforcement of an arbitration clause contained within a Collective Bargaining Agreement.

II. Merits

■ It hardly need be said that "national labor policy" favors arbitration as an agreed-upon means of resolving labor disputes without resort to either the courts or to the National Labor Relations Board. Buffalo Forge Co. v. Steelworkers, supra; Boys Markets, Inc. v. Retail Clerks Union, supra; International Ass'n of Mach. & A. Wkrs. v. General Elec. Co., supra. Concomitantly, when a court is called upon to review the validity of an award which is the result of a consensual arbitration, its review is limited primarily to whether the underlying dispute is one which the parties agreed to arbitrate, with any doubts being resolved in favor or arbitrability. International Ass'n of Mach. & A. Wkrs. v. General Elec. Co., supra; Metal Products Workers Union, Local 1645 v. Torrington Co., 358 F.2d 103 (2d Cir. 1966); K.C. Royals v. Maj. League

Baseball Players' Ass'n., 409 F.Supp. 233 (W.D.Mo.1976), aff'd 532 F.2d 615 (8th Cir. 1976); see also 9 U.S.C. § 10(d).

The question now presented, however, is not whether or not the underlying dispute is arbitrable, but rather before what forum it should be heard. The issue turns upon whether the disagreement is fairly characterized as one involving the interpretation, or a violation of, the collective bargaining agreement in which case the matter was properly brought before the local Joint Trade Board, or whether instead the question was one of jurisdiction, for which the Impartial Jurisdictional Disputes Board would have been the proper arbiter.

The Court has had an opportunity to review all of the agreements, communication exchanges, and various rules for the resolution of disputes pertaining to this case. Moreover, the Court has been able to substantially trace the chronology of events with respect to the present dispute from its inception in October of 1976. The only conclusion which can fairly be reached is that the grievance which formed the basis for the local Joint Trade Board award, relating as it did to whether certain work assigned by Stone and Webster to members of the Operating Engineers local was or was not "touch-up painting" within the meaning of an agreement entered into by the parties and the painters' and operating engineers' international unions under the auspices of the Impartial Jurisdictional Disputes Board, was a spin-off of the earlier jurisdictional dispute, and was accordingly improperly submitted to the local Joint Trade Board. See Collective Bargaining Agreement (Exhibit 1, appended to Hearing Exhibit 1) Article XI, section 10.

■ The facts of this case are virtually identical to those in Sheet Metal Wkrs. Int. Ass'n v. Los Alamos Const., 550 F.2d 1258

4. The Court rejects the notion that the local Joint Trade Board award cannot be properly characterized as an arbiter's award. That suggestion flies in the face of the very language of the heading which accompanies Article XV of the Agreement between the parties ("Arbitration and Joint Trade Board"), which article relates exclusively to the Joint Trade Board and its composition, powers and duties. A fair reading of the contract as a whole further leads one to the conclusion that the parties have agreed to forego all other remedies, with respect to questions of interpretation or violation of the Agreement except jurisdictional disputes in favor of submission of the matter to the Joint Trade Board.

(10th Cir. 1977), wherein the Court of Appeals affirmed a district court's ruling, upon a motion for summary judgment, that the dispute at bar was jurisdictional, rather than over the interpretation of the parties' collective bargaining agreement. The logic of this conclusion is obvious. The essence of the disagreement in both *Sheet Metal Workers* and the present case concerned which of two groups of laborers was entitled to the work assignments in issue, thereby squarely presenting a jurisdictional question rather than one of interpretation of a Collective Bargaining Agreement. See *N.L.R.B. v. Local 1291, International Longshoremen's Ass'n.*, 368 F.2d 107 (3d Cir. 1966), cert. den. 386 U.S. 1033, 87 S.Ct. 1482, 18 L.Ed.2d 595 (1967); *International Bro. of Carpenters v. C.J. Montag & Sons, Inc.*, 335 F.2d 216 (9th Cir. 1964), cert. den. 379 U.S. 999, 85 S.Ct. 719, 13 L.Ed.2d 701 (1965). When cast in this light, it is clear that the presence of three parties, the employer and two competing unions, is required for a fair and complete adjudication of the matter. Such a complete adjudication is precisely what the Impartial Jurisdictional Disputes Board could have afforded the parties in lieu of the piecemeal adjudication offered by the local Joint Trade Board. *Local Union No. 1423, Glaziers, Etc. v. P.P.G. Industries, Inc.*, 378 F.Supp. 991 (N.D.Ind.1974); see also *International Bro. of Carpenters v. C.J. Montag & Sons, Inc., supra.* To allow Stone and Webster to be subject to a partial adjudication of the dispute by the local Joint Trade Board, with the distinct possibility that the Operating Engineers could then seek and perhaps obtain a contrary and equally binding ruling through a grievance procedure of its own would be manifestly unfair, and will not be sanctioned by this Court absent convincing evidence that Stone and Webster agreed to be bound in such a fashion. *N.L.R.B. v. Radio Engineers*, 364 U.S. 573, 81 S.Ct. 330, 5 L.Ed.2d 302 (1961).

## ORDER

Based upon the foregoing, it is this Court's opinion that the award of the local Joint Trade Board must be vacated, and the parties directed to resolve the dispute in accordance with the Procedural Rules and Regulations of the Impartial Jurisdictional Disputes Board and the Plan for Settlement of Jurisdictional Disputes in the Construction Industry, by which both of the parties (and the Operating Engineers) agreed to be bound. The plaintiff's motion for a preliminary injunction is denied.

It is so ordered.